Good morning, my name is Kate Niswender and I represent Mr. Appel. This is the... Are those charts you have with you, have you shown them to your opposing counsel? No, Your Honor, these were all exhibits during trial. Okay. I just asked if she showed them to the Court that I could see them at the same time. Okay. All right. This is the second time we have been before this Court. We were here four years ago after the Court granted summary judgment to the government, the trial court. This Court reversed that judgment because the issue was as stated in your decision, the precise location of the high-water mark. To be exact, the issue was and is the precise location of the high-water mark on the APPEL parcel for the years 1989 through 1994. Anything after 1994 is not relevant because APPEL is charged with placing fill material into the high-water mark of the river prior to December of 1994. The dates are important because the government's high-water mark determination for trial was made in 2001, two miles downstream and seven years after the fact. I have some photos, as you can notice, that were used during trial in this case. This first one, and I will try to hold it so that both the Court and counsel can see, this map, or actually photo, was taken in 1994. Which exhibit was it below? Pardon me? Which exhibit was it below? 602. You can have the original stickers on them. It's also found in the record at 682 in a very small version. On this photo, as well as others from this same period, you can see exactly where the river runs. I would remind the Court of what was said to Mr. APPEL by Ventura County Judge John Smiley in 1992. He said, stab at the river. The markings on this photo were drawn by APPEL's trial expert, Glenn Hawks, during his deposition. You can see by this marking here, that's where the water is physically running across the parcel as of the date of this photo, August of 1994. Mr. APPEL has steadfastly insisted that he followed Judge Smiley's order, and he stayed away from the river, that he never placed anything in the Ventura River. If you can see from these diagrams drawn on there by Mr. Hawks, all of Mr. APPEL's activities were outside of the high water mark of the river. I have to emphasize at this point Mr. Hawks' expertise. He's been in the business of mapping surface flows and limit lines for more than 30 years. He is extremely familiar with determining the high water mark of a river system. The government called him inexperienced because he had not done a high water mark determination under EPA regulations, but the EPA regulation is based on standard industry practice, and as noted in the trial testimony of Mr. Hawks, the regulation is virtually identical to standard industry language for determining surface flows and limit lines. One more thing on this photo. You can see from the markings where the government's Mark Gookin declared that fill activities had taken place, where it says berm E, berm F, berm A. All of these activities were well away from the river. However, when the government prepared the TIERRA reports, this was in 1995, these called for restorations of 7 1⁄2 acres of wetlands over here on the west side of the property. As of today, the government's new restoration plan calls for the digging of channels here on the east side of the property where all these trees are. In addition, Mr. Apple is required to plant hundreds of trees within areas that the EPA has declared to be jurisdictional, and I would remind the court of the definition of high water mark, that it is an area where the high water usually runs and terrestrial vegetation cannot grow, and yet he's going to be planting hundreds of trees under the high water mark of the river. The second map is found in the excerpts at page 1272. It is an unmodified topographic map of the Apple parcel taken in June of 1995. We've imposed onto it in red the outline of the Apple property boundary. The river was running on this date at 80 CFS, as shown on the water charts of the U.S. Geological Survey at page 342 of the excerpts. The blue area is where the person who did this map, who drafted this topographic map, indicated Ventura River on the face of the map. We've just colored it in. It is very similar to Hawk's determination of where the river was running in 1994, and if you match these maps up and you take a look at them, you can see that the location of the river is very similar. Here's the river. Here's the river. Finally, this was prepared by the government's expert, Mark Gookin. It was exhibit 447 of trial. It's in the excerpts at 1353. It is Gookin's estimation of where the water would flow on the Apple property at a surface flow of 400 CFS. You can see that it is closely related to the actual photos, and it's closely related to the topographic map. The river itself, where the water flows, in any of these photos, in any of these maps, is never more than 50 to 150 feet wide. Which brings me to one more point. If you look in the record as well, there's other maps that Mr. Gookin prepared showing much higher surface flows, surface flows of 7,000 CFS. In that case, it covers the entire basin of the river. All of the photos, all of the topographic maps show a defined bed and banks for the river. Which brings us to this issue of water flow. All of the cases, without exception, talk about ordinary flow without reference to spring floods or summer droughts. The 400 CFS figure used by Robert Eyre in the Sudbury Judgment Motion and used by Glenn Haas at trial was done out of deference to the government's own witnesses. Both Mark Gookin and Chris Nordby said the ordinary winter flow was 400 CFS. Glenn Haas said it was reasonable but high. He said 200 to 250 would be more accurate. The average flow, however, for the 60 years that records are available, is 60 CFS. That is the mean flow for 60 years. In the reply brief, we explained some of the methods used for estimating average discharge and mean annual flow. In a heavy rain year, you're looking at, as Haas said, as being more reasonable, 200 to 250. Obviously, that is far less than the 400 used to determine the ordinary high water mark, but more importantly, it is a fraction of the 7,000 CFS used by Gookin. And the government cannot justify use of that kind of high figure to determine high water mark. The government insists and insisted during trial that use of flood flows was appropriate, but there's nothing in case law or in statute to support that position. If they're going to determine the precise location of the high water mark of the Ventura River, it cannot include flood flows. The government has argued that the amount of water flowing down the river is immaterial to a high water mark determination. But to ignore the water flows is to exclude portions of the regulation from consideration. The regulation clearly states that fluctuations of water is part of any viable high water mark determination. By excluding information easily available on USGS water charts, the government is eviscerating their own regulation. Now, at trial, government also argued that high water mark protection must extend laterally to areas outside of the high water mark, areas that look and function like a river. Now, the rationale for this, expressed in the testimony of Mr. Cetron, was that the chemical and ecological functions of the areas surrounding a river are important and that the Clean Water Act should require protecting areas that funnel water into a river. Nothing in case law, nothing in statute to support this. And, in fact, the Harrell case, it's U.S. versus Harrell, cited at page 32 of the opening brief, called the government's argument to extend its jurisdiction laterally to include areas outside the high water mark, they called that ludicrous. I cannot ignore, in the comments I'm making to you this morning, the misrepresentations of the government in this matter. The criminal conviction obtained against Mr. Appel was based on a misrepresentation, and as detailed in the opening brief, the government's misrepresentations and changes in its story are too many to chronicle this morning. Furthermore, the government's attacks at trial on the credibility of the only real hydrologist in this case, Glenn Hawks, are meritless. Hawks has the experience to make a high water mark determination. His determination matches... Here, on Mr. Hawks' testimony, the district court made a credibility finding, and we review that under the clearly erroneous standard. So once the district court, who observed Mr. Hawks and evaluated the problems with his computer study, made that finding, how do you get around that? Because the court's findings of fact and conclusions of law do not match the Hawks' testimony. For example... Do not what? Do not match the Hawks' testimony. For example, at one point, and we actually put a section in the opening brief on this, but she said he did a computer model. He used a computer model, in fact, as one part of a much more extensive analysis. At one point in the findings, the court makes a conclusion of finding of fact that Mr. Hawks said that surface water had to be continuously flowing in the river in order to do a high water mark determination. He said nothing of the sort. He said that water must normally... be used for a high water mark determination, but in the Ventura River, because surface flows are often zero, the determination of a proper high flow amount is somewhat subjective. And he went on to say, I'm going to use 400 even though 250 is probably more appropriate. The court indicated in another place that he did not take erosion or erodibility into concern, into consideration, whereas, as in fact in his testimony, he did. These are clear errors, and it was as if the court did not take any of Mr. Hawks' comments at all into consideration. It was a... The opening brief details that. I think it's the last section of the brief. I can look at it and find you the page, but we go piece by piece and show where the district court said Mr. Hawks did not include X, whereas, in fact, he did. And it happened over and over again, as if she wasn't hearing a thing that he said. Even so, even if Mr. Hawks' testimony is found not to be credible, the fact that the government included flood flows in its determination is a huge problem in this case. Didn't the government explicitly exclude flood flows? Isn't that just not the case in this case? No, Your Honor. They exclude. In fact, the district court repeated that, that they had excluded flood flows in determining the ordinary high water mark. The government indicated that there was no reason to include water chart information at all and that water information was irrelevant. And the reason they said that was because CETRON, they said, had gone out and done an inspection of the physical characteristics of the land and that was sufficient under the regulation to make a determination. But what's wrong with the field observation method? Isn't it explicitly one of the alternative methods for determining the ordinary high water mark sanctioned by the statute? Field observation is one portion of the regulation. It also indicates that fluctuations of, fluctuation of water is a, it's, if you read the actual reg, it starts out by saying, determining the fluctuation of water and, and then it goes on to list other things, as well as determining physical characteristics, shelving, scouring, and looking for terrestrial vegetation. So fluctuation of water is the first thing that the regulation cites to. Now, he went out, he, Mr. CETRON, went out in 1994 not looking for high water mark indicators. He looked for wetland indicators. In 2001, he went out there to a place two miles downstream and did a very detailed analysis of scour lines and whack lines, etc. He went two miles downstream, took pictures, and said, this is what you look for in a high water mark determination. What is most telling is not his 2001 testimony as to what a good high water mark determination would be, but rather that there is no evidence of that having occurred in 1994. There are no pictures. There's no showing of rack lines. There's no showing of algae showing up on rocks. None of that because he went out to do a wetlands determination and that's what he did. So if you want to go back and figure it out post hoc, you go, okay, we didn't look in 1994. Let's do it a second time. You have to look at the fluctuations of water as indicated on the water charts and then go back and determine what the lines would be and do a field inspection, and that's what Mr. Haas did. He went out and recreated the situation as best as possible from 1994, and he did so a few years after the fact. So it reflects topography, field characteristics, and fluctuations of water. Interestingly, and I think this is an important point when you start talking about water charts, the government says that 18 acres of the apple parcel is under the high water mark of the Ventura River. That would mean its flow is literally hundreds of feet across. The flow, a flow like that only occurs during floods. It only occurs during very high rain events. And the number that the government's Mark Gookin pulled out was 6,900 CFS, which is a 1.5-year flood reoccurrence. And the cases, incidentally, specifically say you can't do that. The 6,900 CFS matches pretty closely the wetlands determination that was made in 1994, but it includes literally hundreds of feet across a river that during 330 days of the year has a flow that's no more than 50 to 150 feet across. That's on a wet year. So by excluding the flood, by excluding the water question, what you can do on the Ventura River is create a false impression of high water mark. You go out there and look at what flood flows have left behind. And you could find a scour mark on a rock 200 feet away from the river itself because that's what happens if there's a sheet flow that occurs during a flood on the Ventura River. It just kind of spreads out, and then it goes back down to the normal 20 to 40 CFS that it has in it most of the time. I'd like to reserve just a couple minutes at least for rebuttal, so I will move on. Thank you, counsel. Good morning, Your Honors. May it please the Court. My name is Todd Agard. I'm here for the United States. I want to make three brief points this morning, and I'll summarize them first. The first is that at issuing this appeal are findings of fact that are reviewed only for clear error, and that includes credibility determinations which are reviewed under a particularly heightened deference. The second issue is that the District Court reasonably credited the government's evidence over Mr. Apple's evidence in a thorough 63-page decision. And finally, the government did not use floodwaters to determine the ordinary high water mark in this case, and so the issue of whether floodwaters can be used to determine an ordinary high water mark is simply not presented and not in dispute here. As to the standard of review, this appeal involves findings of fact that were entered after a trial at which both sides presented their competing evidence. The District Court carefully reviewed this evidence in its thorough 63-page decision and made its findings based on credibility determinations of the various experts that were proffered. On appeal, this Court gives great deference to the District Court's credibility determinations and findings of fact, and here Mr. Apple is actually just re-arguing the same arguments that he made in front of the District Court, his interpretation of the evidence, as opposed to identifying any clear error of judgment on the part of the District Court. Now to look at the merits of the District Court's decision, the District Court was presented with a choice between the government's method of determining the ordinary high water mark and Mr. Apple's method. The District Court properly credited the government's method, which examined Mr. Apple's property through historical aerial photographs and field investigation, and what the government was looking for were physical characteristics associated with prolonged and frequent inundation. And I can't emphasize that term enough, prolonged and frequent inundation, because it permeates the District Court's decision. The expert basically said that you can look at the physical characteristics and determine whether the stains or the marks or whatever they are, are made by regular flows as opposed to high flows or unusual floods. Exactly, exactly. And we go through that in our brief, but just to give a few examples, he would point out where there was a boulder with an algae stain on it that would only arise if there were sustained periods of water, sustained periods of time where water at that level, and then above that there would be some vegetative debris in a branch, and he would say that's the kind of thing that would only be left by a flood, whereas this watermark, this algae stain, could only happen during a more frequent event, not a rare flood. And as I said, we go through that in our brief in relative detail, but he and then the District Court credited that testimony, went through in detail to explain, here's a rare flood, here's an ordinary high water flow, they are different, they leave behind different signs, and my field investigation can differentiate between them. And the District Court found that explanation credible. The District Court, on the other hand, and like I said, so he was looking at water stains, algae growth, erosion patterns, vegetation that will only live in areas of prolonged and frequent inundation, the soil type that arises, all these are indicators of areas of the riverbed that were subject to prolonged and frequent inundation. Now the District Court properly rejected Apple's method, which used a simple arithmetic model for three different reasons. First, his mathematical model was simplistic and did not reflect real-world conditions. And Mr. Gookin walked through his analysis and then said, if you were going to do a proper mathematical model, here are some of the factors that you'd have to take into account, and here is how Mr. Hawks did not do that. The District Court reviewed that and found that credible. In addition, he made errors in applying his method. He used an average flow rate rather than an ordinary high flow rate. He used a model that was designed to analyze constructed flood control channels rather than natural riverbeds. There was a number of mistakes that he made at the District Court. Those were pointed out by the government's rebuttal experts and credited by the District Court. And finally, Mr. Hawks' method predicted that there would not be water in areas where aerial photographs proved that there were water, even during relatively dry times of the year. So the empirical evidence rebutted the predictions that Mr. Hawks would make. Finally, this issue of floodwaters. The government did not use floodwaters to determine an ordinary high water mark. So as I said, that issue was simply not presented here. And if you look at the District Court's opinion on pages 1192 to 93 of the excerpts of record, the District Court specifically made the distinction between ordinary high flows and floodwaters and noted that the ordinary high water flow, by implication not the floodwaters, were the basis of the ordinary high water mark. Indeed, Mr. Hawks himself testified at 1085 of the record that he and the government were in agreement that floodwaters were not used, should not be used to make an ordinary high water mark determination. Now, Mr. Apple has at some times in his briefing tried to conflate the term peak flows with floodwaters. But if you look at page 1478 of the record, there Mr. Hawks conceives that peak flows are not the same as floodwaters and that peak flows could sometimes be used as integrated into an ordinary high water mark determination, whereas floodwaters should not. Finally, as I mentioned before, the government's determination of the ordinary high water mark used field observations that looked to physical characteristics associated with prolonged and regular inundation. That idea of prolonged and regular inundation is antithetical to the idea of rare floodwaters. And so the idea that the government has used rare floodwaters in spite of what it found and what the district court found, I think is simply not credible and was found as such by the district court. Now, Mr. Apple has made, or his counsel has made a couple of points this morning that I wanted to just briefly address. They say that the government ignored water flows in its determination. That's not true. The government did not look at water flow data, but its field observation was a method of getting at flows. It just wasn't using the numerical method that Mr. Hawks proffered. In addition, I would point out that the river flow data that he's using is from two miles downstream, and so it's not something on site on Mr. Apple's property that is an indication. Second point that she talked about, that the government went beyond the ordinary high-water mark to look at areas that look and function like a river. No, no, no. What the government did was it said an ordinary high-water mark will show areas of the riverbed that look and function like a river. And that's just common sense. Where is the river? The river is areas of the riverbed that look and function like the river. And I think I've addressed the remaining points. If the court has any further questions, we'll just rest on a brief. Her sort of point-by-point taking on the district court as to Mr. Hawks' testimony I think has gone into great detail in our answering brief, and I'll just rely on that unless the court has to speak. Thank you, counsel. Thank you. Very briefly, the court is to use a de novo standard of review on legal questions, and there are two legal questions that should be addressed in this case. One is whether or not flood flows should be excluded, and I think the case law is fairly clear on that. The second one is whether or not the EPA can include what they call the lateral extent of the high-water mark. The government has just indicated that that was not done, but at page 788 of the excerpts, and again at 1341, Mr. Cetron indicated that he was including areas outside the high-water mark that looked and functioned like a river because there was a purpose behind the CWA, and that was to preserve the function of a river, and so you have to preserve things outside the river. That's very clear in his testimony. As far as whether or not there were flood flows included by the government, if 18 acres of the Apple property is included, this property, this is 31 acres total. 18 acres of that is included. You're looking at a huge swath of land, and the only way you get there, the only way is by including flood flows. You cannot get there without including 6,900 to 7,000 CFS, something that shows up once every couple of years on that river. Now, the only way he gets there to have water flows equal where Mr. Cetron says those 18 acres is is to include a phenomenal amount of water, because you can't just say that the river is under the high-water mark of the river, the land is under the high-water mark, unless there are all those indicators in the regulation, not just physical characteristics, but the fluctuations of water, the first and the most important issue. Mr. Agard just argued that Mr. Hawks was incorrect in several areas, and the court found it so, specifically because he used ordinary flows rather than ordinary high flows. Again, we're back to the flood issue. Mr. Hawks used 400 CFS. His 400 CFS matches what it says on the topographic map. It matches what it says on every photo of this area from as far back as the photos were reviewed. The photos all show a defined bed and banks. The photos all show a 50- to 150-foot-wide river. They do not show a sheet flow across the river, a sheet flow, by the way, that underneath which grow trees and plants, and things live there. This is the... Something under the high-water mark of a river cannot have a tree growing in it. It can't have a bush. It's under the high-water mark, where terrestrial vegetation cannot survive. That's in the reg. So if he has the 6,900 CFS sheet flow going across 18 acres of the Apple parcel, that's not high-water mark. It may be something else, but it is not high-water mark. And he called wetlands at one point. If he had stuck by that, we might not be here. I don't know. But he switched to high-water mark for some reason, and they have off and on stuck to that story for eight years. But what happened with Mr. Cetron and his multi-changing story and the use of flood flows, the exclusion of flood flows, all these issues has resulted in a great injustice, and I would strongly urge the Court to go back and read our chronology in our opening brief about how many times the story is switched back and forth. This fight did not take place against a major land developer. It took place against a tree trimmer who owns some land and was putting tree chips on the land on areas 8 to 10 feet above where water flowed. And the next thing you know, he's being told that his entire 31-acre parcel, 18 acres of it, is underwater. This is not a logical case. This is not a straightforward case that you normally would see in a Clean Water Act situation. So with that, I know I've run out of time, and I will not keep you any further. Thank you, counsel. Thank you both very much. The case just argued will be submitted. The final case of the morning for oral argument is Chodos v. West Publishing Company. Morning, counsel.
judges: Browning, Reinhardt, Wardlaw